MGRS



1　Michael E. Reznick, Esq. State Bar No. 116126
　　LAW OFFICES OF MICHAEL E. REZNICK,
2　A Professional Corporation
　　283 Ocho Rios Way
3　Oak Park, California 91377-5540
　　Tel: (818) 437-5630 (Cell)
4　Email: reznagoura@aol.com

5　Attorney for Plaintiffs GREGORY SMITH, M.D. and
　　CARMELITA YAMBALIA
6

```
┌─────────────────────────────────┐
│            FILED                │
│                                 │
│         JAN 11 2021             │
│                                 │
│ UNITED STATES BANKRUPTCY COURT  │
│  EASTERN DISTRICT OF CALIFORNIA │
└─────────────────────────────────┘
```

7　　　　　　UNITED STATES BANKRUPTCY COURT

8　　　　　　EASTERN DISTRICT OF CALIFORNIA

9　GREGORY G. SMITH, M.D., a Professional　　| Case No. 20-24783-A-11　24 - 02003
10　Corporation,

11　　　　　　Debtor　　　　　　　　　　　| Docket Control No.: MHK - _____

12　────────────────────────────────　| ADVERSARY COMPLAINT FOR:

GREGORY G. SMITH, M.D., individually and as
13　the genuine physician-owner of GREGORY G.
　　SMITH, M.D., A Professional Corporation;
14　CARMELITA YAMBALIA, an individual,

15　　　　　　Plaintiffs,

16　v.

AMIR FRIEDMAN, M.D., an individual;
17　MITESHKUMAR PATEL, aka MITESH PATEL,
　　aka MIKE PATEL, individually and as the
18　fraudulent, putative de-facto majority owner,
　　director and officer of the Debtor-In-Possession,
19　GREGORY G. SMITH, M.D., a Professional
　　Corporation; SARATH ARTHAM, an individual;
20　SUCHIR ARTHAM, an individual; MEDITAB
　　SOFTWARE, INC., a California corporation;
21　MEDVISION, INC., an Illinois corporation;
　　MEDPHARM SERVICES, LLC, a Puerto Rico
22　limited liability company; DR CATALYST LLC,
　　a Puerto Rico limited liability company; NIVANO
23　PHYSICIANS, INC, a California corporation;
　　PARAGI PATEL, an individual; DAVID KYLE,
24　D.O., an individual; MIKHAIL PALATNIK,
　　M.D., an individual; YVETTE HARGROVE-
25　BROWN, M.D., M.H.A., MEd, an individual;
　　CARMEN HERNANDEZ, M.D., an individual;
26　DANIEL ROSE, M.D., an individual; CLINICA
　　MEDICA GENERAL, a California corporation;
27　VENU KONDLE, M.D., an individual; ALBERT
　　SOSA, an individual; CHUKWUKA CHIDI, CPA,
28　an individual;

　　　　　　Defendants.

Case No. 20-24783-A-11　24 - 02003

Docket Control No.: MHK - _____

### ADVERSARY COMPLAINT FOR:

1. **Violation of False Claims Act (Lincoln Law)**
   - Medicare And Procurement Fraud
   - Noncompliance with HIPPA
2. **Unfair Competition (Theft of Patient Files and Customer Lists)**
3. **Rescission and Restitution (Stock Purchase Agreement)**
4. **Breach of Contract (Stock Purchase Agreement)**
5. **Fraud and Deceit**
6. **Declaratory Relief**
7. **Injunctive Relief**
8. **Avoiding Fraudulent Transfers**
9. **Avoiding and Recovering Preferences**
10. **Disallowance of Claims**
11. **Unjust Enrichment**

1



## INTRODUCTION AND NATURE OF PLAINTIFFS' CLAIMS

### Defendants' "Fraudulent Scheme" To Commit Medicare And Procurement Fraud
### And Related Misconduct Causing Substantial Damages To the United States of America, Plaintiffs
### And The Debtor

1.   This is an action brought by Plaintiffs GREGORY G. SMITH, M.D. ("Dr. Smith"), individually and as the *genuine* physician-owner of GREGORY G. SMITH, M.D., a Professional Corporation ("Smith Inc.") and CARMELITA YAMBALIA, his wife ("Mrs. Smith") (hereinafter the "Plaintiffs") under the federal "False Claims Act" ("FCA"), also called the "Lincoln Law," based on rampant Medicare and procurement fraud committed by defendants herein, and each of them s more particularly described herein below. Defendant's misconduct and wrongful acts also include multiple and continuing HIPPA violations, unfair competition and other fraudulent acts, including fraudulent conveyances, to the detriment of Plaintiffs and the debtor herein, requiring immediate injunctive relief.

2.   At all times herein mentioned, defendants were all agents of each of their codefendants and in doing the wrongful acts alleged herein were acting in the scope of their agency.

3.   The FCA is a federal law that imposes liability on persons and companies (typically federal contractors, including healthcare providers, health plans and related entities that contract with Medicare) who defraud governmental programs - including programs such as "Medicare." It is the federal Government's primary litigation tool in combating fraud against the Government.

4.   The FCA includes a "qui tam" provision that allows people who are not affiliated with the government, called "relators" under the law, to file actions on behalf of the government (informally called "whistleblowing" especially when the relator is employed by or, like the Plaintiffs herein, are intimately close to or otherwise affiliated with the organization accused in the suit).

5.   Persons filing under the FCA receive a portion (15-30 percent, depending on certain factors) of any recovered damages.

6.   Plaintiffs are suing herein to recover in their individual capacity as well as in their capacity as "relators," or "whistleblowers," under the FCA.

7. At all times herein mentioned, the Medicare and procurement fraud, HIPPA violations, unfair competition and fraudulent and wrongful acts done in furtherance thereof, also included multiple but not limited to the fraudulent conveyances controlled by the other defendants as loans from the debtor to related companies owned and intercompany loans made by defendants within days of filing the instant bankruptcy. The wrongful and despicable acts were perpetrated by defendants pursuant to a fraudulent scheme orchestrated and spearheaded by defendant MITESHKUMAR PATEL, aka MITESH PATEL, aka MIKE PATEL ("Patel"), a registered pharmacist by trade with a penchant, long history and pattern and practice of wrongfully acquiring thriving medical practices under false pretenses from unsuspecting physician-owners, like Dr. Smith, that he and his co-defendant cronies intentionally "dupe" such physicians into selling. In particular, in reliance on false promises and representations made by Patel and his codefendants, unwitting doctors are persuaded by Patel's fraudulent scheme to transfer or otherwise give up 51% or more of the shares of their respective medical practices. Patel's undisclosed purpose in perpetrating his fraudulent scheme, as described herein below, is so he can acquire valuable patient files to convert into electronic medical records ("EMR") for sale in India and other foreign jurisdictions, as more particularly alleged herein below, without the patients' knowledge or informed consent.

8. Pursuant to and in furtherance of Patel's pattern and practice and fraudulent scheme (that he has honed and "fine-tuned" the years by conning countless other duped physicians out of their medical practices, with the assistance of Friedman and Palatnik, long before perpetrating the fraudulent acts that gave rise to this adversary proceeding), Patel replaces owner physicians (who unwittingly remain on the medical practice "books" and records and more importantly, on "Superbills" and other documentary evidence relied on by Medicare to pay claims and other patient costs and expenses as the "Supervising Physician") with "imposter" physicians like Friedman and Palatnik, who are either convicted felons who are unauthorized by the Board of Medical Assurance to or treat patients, like Friedman, who was recently indicted by the federal government for Medicare fraud in an unrelated case, or physicians who are unlicensed or whose licenses are in jeopardy for committing similar misconduct against Medicare.

9. At all times herein mentioned, Patel's "procurement fraud" consisted and currently consists of

billing Medicare the highest prices for generic prescription drugs and medicine manufactured and distributed by his related Puerto Rican limited liability company codefendants named herein below.

10. At all times herein mentioned, Patel, aided and abetted by his codefendants, also overbilled Medicare, billed for nonexistent patients, billed for complicated, expensive procedures that in fact were cheap and routine are not required at all.

11. At all times herein mentioned, Patel also created a "ruse" or smokescreen pursuant to which he represented to Medicare that his healthcare provider's "supervising physician" – typically a seasoned, veteran medical doctor and co-owner of Patel's target medical practice, like Dr. Smith - when in fact he and his codefendants and cronies' game plan from the outset what is and is "freeze out" such physicians, like Dr. Smith, and replace them with imposters like many of the physicians named herein as codefendants.

12. At all times herein mentioned, the real purpose and intent of Patel's fraudulent scheme was and is to acquire through fraudulent means the target physician's clinic patient files that he and his related business entities and imposter cronies transform into "Electronic Medical Records" ("EMR") that he then sells multiple times over through other business entity conduits in his native India and other foreign countries for substantial profits.

13. At all times here mentioned, Patel's fraudulent scheme and the wrongful acts that he and his cronies committed and continue to commit in furtherance thereof violate multiple Medicare regulations and rules, not to mention HIPAA rules and regulations that are designed to protect Medicare patients' "Protected Health Information" ("PHI") by keeping them private, maintaining their secrecy and doing everything possible to avoid improper dissemination or sale to third parties.

14. At all times herein mentioned, Patel and his codefendants not only committed Medicare and procurement fraud for the reasons alleged herein below, but also violated HIPAA rules and laws (and thus, Medicare's mandatory compliance requirements) by failing in their duty to protect the privacy of patients and the confidentiality of patient health data every time they transferred and sold patient EMR overseas to India and other foreign jurisdictions without the knowledge of con consent of the patient

15. Plaintiffs are asserting claims in this case to recover damages against defendants for their own

benefit and under the FCA as "whistleblowers" and "relators" to recover (and share in the recovery of) countless millions of dollars that was stolen by defendants from the United States government and in particular, from Medicare, by seeking and wrongfully taking payments from Medicare under a number of false pretenses, including the following:

1. Submitting "Superbills" to Medicare for payment for nonexistent patients;

2. Falsely charging for expensive procedures that never occurred;

3. Falsely representing that the clinics operated by defendants complied with Medicare rules and procedures;

4. Falsely representing to Medicare that the unlicensed physicians, physician assistants and nurse practitioners who Patel employs to treat patients are in fact licensed attending physicians and medical doctors;

5. Falsely submitting "Superbills" identifying Dr. Smith as the "Supervising Physician" or "Medical Doctor" when he has in fact been "frozen out" of his own medical practice by Patel and his codefendants since 2019, as more particularly alleged below; and

6. Billing Medicare for procedures performed by seasoned physicians like Dr. Smith that in fact were performed by laypersons or unlicensed physicians, nurse practitioners and physician assistants.

16. At all times herein mentioned, defendants also committed procurement fraud against the United States government by using the Puerto Rican limited liability companies named herein that were and are owned and controlled by Patel to manufacture and distribute to healthcare providers, including nursing homes, cheap, generic pharmaceutical drugs that he charged Medicare exorbitant fees and costs for.

17. Plaintiffs' private claims for unfair competition, rescission and restitution, breach of contract, fraud and deceit and conversion, similarly pertain to Patel's same pattern and practice of fraud and fraudulent scheme. In particular, Patel fraudulently induced Plaintiffs to sell their managed care medical practice to Patel in reliance on a number of false promises and representations made by Patel in his agents,

including Dr. Palatnik. Among other things, Patel and his cronies falsely represented that he would triple Dr. Smith's clinic revenues by exporting the preparation of billings to the Philippines and all of the clinics' electronic medical records ("EMR") to the Philippines as well as other offshore locations, such as India, where Patel could and did employ cheaper labor to perform billing services, yet concealed from Plaintiffs that the real purpose of acquiring Smith Inc. was to acquire patient files and valuable EMR to sell multiple times over in India and other foreign countries. Patel also concealed from Plaintiffs the fact that Smith Inc. was ostensibly majority owned by a straw dog physician but in fact was owned and controlled by Patel and or his related companies.   Most importantly, Patel concealed the fact that his fraudulent scheme violated Medicare rules and procedures as well as HIPAA laws because none of Smith Inc.'s patients knew or consented to the transfer of their private medical records to strangers offshore, or to countries other than the United States of America. Plaintiffs also seek to recover from defendants jointly and severally, corporate funds that were wrongfully embezzled by Patel and his cronies while serving as the debtor-in-possession since the bankruptcy filing from the debtor in possession's corporate account to accounts for Patel owned businesses unrelated to the debtor in for Patel's personal use and benefit, including but not limited to defendant PALATNIK SMITH HEALTH CORPORATION, a California corporation ("Palatnik Health"), which was expressly formed by Patel, Friedman, Palatnik and Patel's other codefendants and cronies for the purpose of hiding money from the bankruptcy court prior to and during this Chapter 11 proceeding.

## JURISDICTION AND VENUE

18.  This Complaint commences an adversary proceeding within the meeting of Federal Rule of Bankruptcy Procedure 7001(6). This adversary proceeding is brought pursuant to Sections 547, 548(a)(1)(A) and 550 of the Bankruptcy Code, 11 USC section 101 et seq. (the "Bankruptcy Code") and California Civil Code section 3439.01 et seq. This Court has jurisdiction over this proceeding pursuant to 28 USC section 1334(b), section 157(a) and section 157(b)(2)(H).

19.  Venue for this adversary proceeding properly lies in this judicial district pursuant to 28 USC section 1409(a) in that this proceeding is related to a case under title 11 of the Bankruptcy Code .

20.  This is a core proceeding pursuant to 28 USC section 157.

6

**THE PARTIES**

21. Plaintiff GREGORY G. SMITH, M.D. ("Dr. Smith") is a medical doctor licensed to practice in the State of California, doing business in Sacramento County, California.

22. At all times herein mentioned, before being duped Smith Inc. into selling his practice to Patel and his "straw dog" under false pretenses. Dr. Smith was and is and is a seasoned physician who owned and controlled thousands of patients and patient files in the greater Sacramento area. At all times herein mentioned, Patel's operation and control of Smith Inc. was and is illegal because while it is ostensibly majority owned by a physician, it is in fact owned, controlled and operated by Patel, who is a pharmacist by trade but not a medical doctor. In addition, Plaintiffs are informed and believe that the physician who ostensibly purchased the stock of Smith Inc. and is listed as Smith Inc.'s attending physician is not licensed to practice medicine in the State of California. As a consequence, the SPA itself, which purported to sell the stock of Smith and to a physician, in fact was a sale to Patel, an unlicensed lay person, not a medical doctor. As a consequence, the SPA was in his unenforceable ab initio.

23. At all times herein mentioned, Patel's fraudulent scheme placed Dr. Smith's medical license in jeopardy and continues to place Dr. Smith's medical license in jeopardy because Smith Inc. is continuing to identify Dr. Smith as the supervising physician on all super bills and other invoices submitted to Medicare when in fact Dr. Smith has been frozen out of his own medical practice pursuant to the fraudulent scheme since 2019. (True and correct copies of exemplars of such billings to Medicare, with the last names of the patients redacted for privacy purposes, are attached hereto as Exhibit A).

24. Accordingly, Dr. Smith is also suing herein as the genuine owner of the debtor-in-possession, GREGORY G. SMITH, M.D., A Professional Corporation ("Smith Inc."), which was stolen from him by Patel, aided and abetted by his codefendants herein, in or about 2018 by fraudulent means pursuant to the fraudulent scheme described hereinabove.

24.. At all times herein mentioned, AMIR FRIEDMAN, a convicted felon, was and is one of Patel's "straw dog" physicians that he used as one of his pawns in his fraudulent scheme to wrongfully acquire Sacramento County medical practices, including Smith Inc. (A true and correct copy of the Friedman fraudulent indictment is attached hereto as Exhibit B). Pursuant to and in furtherance of Patel's

7

and Friedman's fraudulent scheme, aided and abetted by the other codefendants, defendants committed Medicare and procurement fraud in violation of the FCA, violated HIPAA, stole patient files without their knowledge or consent to wrongfully and secretly acquire patient files and in turn create and sell all of the files and EMR defendants acquired from the purchase of Smith Inc. that Patel multiple times in India and other foreign jurisdictions. Regrettably, the fraudulent scheme continues to this day. As a consequence, injunctive relief is necessary and appropriate at this time.

25. MITESHKUMAR PATEL, aka MITESH PATEL, aka MIKE PATEL ("Patel") is and at all times here mentioned was an individual doing business in Sacramento County, California.

26. At all times herein mentioned, Patel was and since 2018 is the unlawful, putative, de facto majority owner of Smith Inc., having acquired all of the stock of Smith Inc. under false pretenses and the guise of a phony stock purchase agreement drafted by Patel and his codefendant, ALBERT SOSA ("Sosa") ("PSA"). The purpose of the phony PSA was to fraudulently induce Dr. Smith and Mrs. Smith to relinquish and give up total control of Smith Inc. to Patel and his codefendants in consideration of a number of false promises that they reasonably relied on (that were designed by Patel and utilized by him on other occasions pursuant to his pattern and practice of fraud and deceit) to persuade Dr. Smith to give up ownership and control in exchange for what Dr. Smith was falsely led to believe would be more freedom and time to devote his efforts on practicing medicine while leaving the burdens of billing submitting claims to Patel and his team (the codefendants).

27. At all times herein mentioned, MEDITAB SOFTWARE, INC. ("Meditab") is a California corporation owned and controlled or indirectly owned and controlled by Patel. All times herein mentioned, Meditab was and is doing business in Sacramento County, California and one of the corporate or other business entity defendants or conduits through which Patel and the other codefendants perpetrated their fraudulent scheme to cheat the United States government and California Department of Managed Care out of millions of dollars as a result of the Medicare fraud and procurement fraud described herein, as well as the other wrongful acts committed herein that harmed Plaintiffs directly.

28. All times herein mentioned, MEDVISION, INC. ("Medvision") is an Illinois corporation owned and controlled or indirectly owned and controlled by Patel. At all times herein mentioned,

Medvision was and is doing business in Sacramento County, California and one of the corporate or other business entity defendants or conduits through which Patel and the other codefendants perpetrated their fraudulent scheme to cheat the United States government and California Department of Managed Care out of millions of dollars as a result of the Medicare and procurement fraud described herein, as well as the other wrongful acts committed herein that harmed plaintiffs directly.

29. MEDPHARM SERVICES, LLC ("Medpharm") is a Puerto Rico limited liability company owned and controlled or indirectly owned and controlled by Patel. At all times herein mentioned, Medvision was and is doing business in Sacramento County, California and one of the corporate or other business entity defendants or conduits through which Patel and the other codefendants perpetrated their fraudulent scheme to cheat the United States government and California Department of Managed Care out of millions of dollars as a result of the Medicare and procurement fraud described herein, as well as the other wrongful acts committed herein that harmed plaintiffs directly.

30. DR CATALYST LLC ("Dr. Catalyst") was and is a Puerto Rico limited liability company owned and controlled or indirectly owned and controlled by Patel. At all times herein mentioned, Dr. Catalyst was and is doing business in Sacramento County, California and one of the corporate or other business entity defendants or conduits through which Patel and the other codefendants perpetrated their fraudulent scheme to cheat the United States government and California Department of Managed Care out of millions of dollars as a result of the Medicare fraud Medicare and procurement fraud described herein, as well as the other wrongful acts committed herein that harmed plaintiffs directly.

31. At all times herein mentioned, NIVANO PHYSICIANS, INC. ("Nivano") was and is a California corporation owned and controlled or indirectly owned or controlled by Patel. At all times herein mentioned, Nivano was and is doing business in Sacramento County, California and one of the corporate or other business entity defendants or conduits through which Patel and the other codefendants perpetrated their fraudulent scheme to cheat the United States government and California Department of Managed Care out of millions of dollars as a result of the Medicare fraud Medicare and procurement fraud described herein, as well as the other wrongful acts committed herein that harmed plaintiffs directly.

32. At all times herein mentioned, Patel and his codefendants formed and created defendants ALLIED CLNICAL TRIAL LLC AND PALATNIK SMITH HEALTH CARE CORP. (using Dr. Smith's name without his knowledge or consent) for the express purpose of receiving fraudulent transfers and funds embezzled rom the debtor within days of filing the petition and during the pendency of this bankruptcy proceeding.

33. At all times herein mentioned, defendant CHUKWUKA CHIDI – Patel's Certified Public Accountant – aided and abetted defendants, and each of them, in setting up and forming and creating these shells that were intended to secrete and hide embezzled funds from the debtor's creditors and the Bankruptcy Court.

34. At all times herein mentioned, PARAGI PATEL was and is Patel's wife and one of the individuals who aided and abetted or served as a conduit through which Patel and the other codefendants perpetrated their fraudulent scheme to cheat the United States and California Department of Managed Care out of millions of dollars as a result of the Medicare and procurement fraud described herein, as well as the other wrongful acts committed herein that harmed Plaintiffs directly.

35. At all times herein mentioned, DAVID KYLE, D.O., was and is one of Patel's "straw dog" physicians that he used as one of his pawns in his fraudulent scheme to wrongfully acquire Sacramento County medical practices, including Smith Inc., for the purpose of committing Medicare and procurement fraud, violating HIPAA, and stealing patient files without their knowledge or consent to wrongfully acquire patients' EMR that he could and did sell multiple times in India and other foreign jurisdictions.

36. At all times herein mentioned, MIKHAIL PALATNIK, M.D., was and is one of Patel's "straw dog" physicians that he used as one of his pawns in his fraudulent scheme to wrongfully acquire Sacramento County medical practices, including Smith Inc., for the purpose of committing Medicare and procurement fraud, violating HIPAA, and stealing patient files without their knowledge or consent to wrongfully acquire patients' EMR that he could and did sell multiple times in India and other foreign jurisdictions.

37. At all times herein mentioned, YVETTE HARGROVE-BROWN, M.D. MHA, MEd, was and is one of Patel's "straw dog" physicians that he used as one of his pawns in his fraudulent scheme to wrongfully acquire Sacramento County medical practices, including Smith Inc., for the purpose of committing Medicare and procurement fraud, violating HIPAA, and stealing patient files without their knowledge or consent to wrongfully acquire patients' EMR that he could and did sell multiple times in India and other foreign jurisdictions.

38. At all times herein mentioned, CARMEN HERNANDEZ, M.D. was and is one of Patel's "straw dog" physicians that he used as one of his pawns in his fraudulent scheme to wrongfully acquire Sacramento County medical practices, including Smith Inc., for the purpose of committing Medicare and procurement fraud, violating HIPAA, and stealing patient files without their knowledge or consent to wrongfully acquire patients' EMR that he could and did sell multiple times in India and other foreign jurisdictions.

39. At all times herein mentioned, DANIEL ROSE, M.D. was and is one of Patel's "straw dog" physicians that he used as one of his pawns in his fraudulent scheme to wrongfully acquire Sacramento County medical practices, including Smith Inc., for the purpose of committing Medicare and procurement fraud, violating HIPAA, and stealing patient files without their knowledge or consent to wrongfully acquire patients' EMR that he could and did sell multiple times in India and other foreign jurisdictions.

40. At all times herein mentioned, VENU KONDLE, M.D. was and is one of Patel's "straw dog" physician that he used as a "pawn" in his fraudulent scheme to wrongfully acquire Sacramento County medical practices, including Smith Inc., for the purpose of committing Medicare and procurement fraud, violating HIPAA, and stealing patient files without their knowledge or consent to wrongfully acquire patients' EMR that he could and did sell multiple times in India and other foreign jurisdictions.

41. At all times herein mentioned, CLINICA MEDICA GENERAL ("Clinica"), was and is a California corporation owned and controlled or indirectly owned or controlled by Patel. At all times herein mentioned, Clinica was and is doing business in Sacramento County, California and one of the corporate or other business entity defendants or conduits through which Patel and the other codefendants perpetrated their fraudulent scheme to cheat the United States and California Department of

Managed Care out of millions of dollars as a result of the Medicare and procurement fraud described herein, as well as the other wrongful acts committed herein that harmed plaintiffs directly.

42. At all times herein mentioned, ALBERT SOSA was and is an officer of Medvision and drafted the SPA on behalf of Patel. Sosa also made a number of the representations relied upon by Dr. Smith in transferring his medical practice to Patel.

43. At all times herein mentioned, SARATH ARTHAM and SUCHIR ARTHAM, aided and abetted Patel, served as a conduit through which Patel and the other codefendants perpetrate his fraudulent scheme and led to cheat the United States and California Department of Managed Care out of millions of dollars as a result of the Medicare fraud Medicare and procurement fraud described herein, as well as the other wrongful acts committed herein that harmed plaintiffs directly.

## FACTS RELEVANT TO ALL OF PLAINTIFFS' CLAIMS

### Patel Fraudulently Induces Dr. Smith

### To Sell Him Smith Inc. Pursuant To His Fraudulent Scheme

43. Dr. Smith turned 65 years old in July 2018 and had concerns about retirement because the thriving medical practices in Sacramento that Dr. Smith formed and created over the last 20 years have become increasingly difficult to own and operate and no longer supported Dr. Smith and Mrs. Smith in a manner which would appear commensurate with Dr. Smith's stature in the medical community. In light of Dr. Smith's considerable knowledge, training, and experience – among other things, Dr. Smith was formerly a Chief of Staff at a well-known Sacramento hospital, director of pharmacy and medical director of the prominent hospice in the Sacramento area. However in the beginning of 2018, Dr. Smith's medical practice, and in particular, Smith Inc., began to evolve and require more administrative matters and in particular, filling out insurance claim forms and forms required by Medicare.

44. Accordingly, Dr. Smith needed some help in the medical director role. Thus, he agreed to meet with the CEO of Nivano who subsequently convinced him to sign a contract with Nivano IPA ("Independent Physician Association") to work with his clinics' managed Medi-Cal patients since that was their only line of business at the time.

45. Dr. Smith passed on Nivano's subsequent offer to buy Smith Inc. or a portion thereof, for reasons unrelated to the issues that are disputed.

46. In or about September 18, 2018, Dr. Smith and Mrs. Smith were approached by Patel and his confident fraudulent team and expressed interest in purchasing all or a portion of Dr. Smith's Sacramento medical practices in particular, Smith Inc.

47. Pursuant to and in furtherance of Patel's fraudulent scheme, and pattern and practice of wrongfully acquiring Sacramento medical practices, Patel provided Dr. Smith and Mrs. Smith with a letter of intent dated September 8, 2018 pursuant to which defendant MedVision, Inc. and its "designated physician" defendant herein, David Kyle, M.D. (who in fact was not a medical doctor at all but rather a doctor of osteopathic medicine, or "D.O."), offered to purchase 100% of the stock of Smith Inc. in consideration of providing various services that Patel would free up Dr. Smith to practice medicine while leaving the burdens of billing Medicare and other insurance companies to Patel and his related companies. As a consequence, Patel represented and promised that this would save substantial costs and expenses.

48. Pursuant to the letter of intent, Dr. Smith subsequently entered into the SPA.

49. At all times herein mentioned, the SPA was in fact, illegal contract under California law because it purported to convey more than 50% of the shares of Smith Inc. to an unlicensed layperson or medical doctor or importantly, the sale was not to a medical doctor at all but to Patel. The contract was also unlawful because it had as its unlawful purpose the improper acquisition of all of Smith Inc.'s EMR for sale in India and other foreign countries multiple times.

50. At all times herein mentioned, defendants, and each of them, also acquired Smith Inc. under false pretenses based on a number of fraudulent representation by Patel. Among other things, defendants, and each of them, fraudulently represented and promised to convert all of Smith Inc.'s files to EMR components, to provide interim to long-term staffing services to Smith Inc. and his PA, minimizing initial costly people over head, reducing work burden and allowing physicians and in particular free Dr. Smith up to do what he does best – caring for patients; providing management systems to Dr. Smith's independent pharmacy with the most complete, fully integrated, intuitive and intelligent pharmacy business software; providing MedVision's application infrastructure for risk bearing entities within the payer and care

13

coordination market space to establish efficient work flow and manage business models; automated pharmacy dosing; bringing together and establishing value-based healthcare delivery system, physician risk enabling infrastructure, and proven operating talent from across healthcare. Most importantly, Patel represented and promised that defendant MedVision as well as Patel's related companies would serve as equal partners to Smith Inc., Dr. Smith and other providers related to them so they could and would end up being more productive and effective in providing high quality, value-based care to their patients. Patel further represented and promised that MedVision and Patel's related companies (i.e., the companies named herein that Patel owns or controls directly or indirectly) would be an important part of the business for years to come, positively impacting access, quality and cost of care to patients.

52. The representations and promises made by Patel pursuant to the letter of intent and SPA were in fact false and known to be false at the time they were made. The true facts were that Patel and his codefendants intended to acquire Smith Inc. for the purpose of acquiring valuable patient files they could convert into EMR and sell to India and other foreign jurisdictions multiple times over without the knowledge and consent of patients.

53. Toward that end, Dr. Smith and Mrs. Smith were "frozen out" of Smith Inc. and effectively denied access to the clinic that was formally owned by Dr. Smith.

54. Defendants, and each of them, continue to freeze out Dr. Smith and Mrs. Smith while using Dr. Smith's prestige and reputation in the Sacramento community to continue to acquire patients and patient files. More importantly, defendants, and each of them, are continuing to identify Dr. Smith as the supervising physician at Smith Inc. to Medicare and other health care provider payers in violation of Medicare rules and regulations.

55. As a result of defendants unauthorized use of Dr. Smith's identity, for their own personal use and benefit, Dr. Smith's license has been placed in jeopardy and is subject to revocation. Accordingly, Dr. Smith is entitled to injunctive relief not only to stop defendants from defrauding Medicare, violating HIPAA, committing unfair competition and engaging in embezzlement from the debtor-in-possession's corporate account and multiple fraudulent conveyances, but also to prevent further unauthorized use of his medical license.

56. At all times herein mentioned, defendants, and each of them, formed two new corporations called "PALATNIK SMITH HEALTH CARE CORP"; called for the purpose of embezzling and stealing money out of the debtor-in-possession's corporate account within days of filing bankruptcy and in fac embezzled $1.2 Million from the debtor, and Allied Clinical Trial LLC.

57. Defendants, and each of them, also committed multiple fraudulent conveyances prior to and within days of filing bankruptcy, transferring multiple real and personal property owned by Smith, Inc., Patel's codefendants.

**FIRST CLAIM FOR RELIEF FOR VIOLATION OF THE FCA**

58. At all times herein mentioned, defendants, and each of them, violated the FCA pursuant to the fraudulent scheme described above.

59. As a direct and proximate result of defendants violation of the FCA, as described hereinabove, the United States government is entitled to recover no less than $500 million, the exact amount to be shown in accordance with proof of the time of trial.

60. As "relators" under the FCA, Plaintiffs are entitled to receive and recover 15% to 30% of the United States government's recovery and hereby request same.

**SECOND CLAIM FOR RELIEF FOR UNFAIR COMPETION**

61. At all times herein mentioned, defendants' fraudulent scheme described above, and in particular, defendants' wrongful and improper acquisition of Plaintiffs' patient files and customer lists, constitutes unfair competition under California and common law.

62. As a direct and proximate result of defendants' fraudulent scheme and unfair competition, as described hereinabove, Plaintiffs have been damaged in an amount not less than $10 million, the exact amount to be shown at the time of trial in accordance with proof.

63. At all times herein mentioned, defendants unfair competition and fraudulent scheme was intentional, fraudulent and malicious. Accordingly, Plaintiffs also seek an award of punitive damages in an amount to be shown in accordance with proof at trial .

**THIRD CLAIM FOR RELIEF FOR RESCISSION AND RESTITUTION OF THE SPA**

64. As result of fraudulent scheme described hereinabove and the illegal purpose of the SPA,

Plaintiffs are entitled to rescind the SPA and receive an order from the Court that the parties be restored to their former positions prior to entering into the SPA.

### FOURTH CLAIM FOR RELIEF FOR BREACH OF THE SPA

65. In the unlikely event that the Court finds and determines that the SPA is not illegal and enforceable, defendants, and each of them, breached the SPA for the reasons described hereinabove.

66. At all times herein mentioned, Plaintiffs performed all the conditions required to be performed by them under the SPA, except for those conditions that were excused by virtue of defendants' nonperformance.

67. As a direct and proximate result of defendants' breach of the SPA, Plaintiffs have been damaged in an amount not less than $10 million.

### FIFTH CLAIM FOR RELIEF FOR FRAUD AND DECEIT

68. At all times herein mentioned, the representations and promises made by defendants in the letter of intent and SPA were false and known to be false at the time they were made by defendants, and each of them. Defendants also committed multiple fraudulent acts in violating the FCA and committing unfair competition against Dr. Smith and Mrs. Smith.

69. Plaintiffs reasonably relied on the representations and promises made by defendants, and each of them, and had no reason to believe statements were untrue..

70. As a direct and proximate result of defendants' fraud and deceit, Plaintiffs have been damaged in an amount not less than $10 million the exact amount to be shown at the time of trial in accordance with proof.

71. The wrongful acts perpetrated by defendants, and each of them, were fraudulent, malicious, and intentional. Plaintiffs are therefore entitled to an award of punitive damages in an amount to be shown in accordance with proof of the time of trial.

### SIXTH CLAIM FOR RELIEF FOR DECLARATORY RELIEF

72. An actual controversy has arisen and now exists between Plaintiffs and defendants in that Plaintiffs contend that defendants, and each of them, violated the FCA, committed unfair competition, and breached the SPA, whereas defendants dispute such contentions. In addition, Plaintiffs contend and

defendants dispute that Plaintiffs are entitled to rescind the PSA for the reasons stated hereinabove, and entitled to restitution,

73.  An adjudication and declaratory judgment is necessary and appropriate at this time so that the parties can ascertain their rights and obligations.

**SEVENTH CLAIM FOR RELIEF FOR INJUNCTIVE RELIEF**

74.  By virtue of the wrongful and fraudulent acts described hereinabove, including defendants' continued violation of the FCA, multiple and continuing HIPAA violations, unfair competition, embezzlement and fraudulent conveyances, Plaintiffs are entitled to a Temporary Restraining Order, preliminary injunction and permanent injunction to enjoin and restrain defendants, and each of them, from further violations of the FCA and from committing or perpetrating the other continuing fraudulent and wrongful acts described hereinabove.

**EIGHTH CLAIM FOR RELIEF TO AVOID FRAUDULENT TRANSFERS**

76.  On or about October 15, 2020, Patel voluntarily instituted and instigated this Chapter 11 proceeding for the improper purpose of terminating (by virtue of the automatic stay) pending litigation that was and is being prosecuted by Dr. Smith in the Los Angeles County Superior Court. The State Court Actions seeks some of the same relief sought in this adversary proceeding based on similar claims.

77.  Plaintiffs are informed and believe, and based thereon aver that the debtor, through Patel, transferred funds and other property of the debtor to a number of third parties, including the defendants herein, within two years of the petition date.  For example, Dr. Smith recently obtained personal knowledge that the debtor transferred more than $1.2 million to two secret companies that defendants created and formed just prior to filing the bankruptcy petition – namely, defendants Allied Clinical Trial, LLC and Platnik Smith Health Corp.

78.  At all times herein mentioned, Patel's indirect, de facto ownership of the debtor and access to the debtor's corporate accounts gave him the opportunity, the debtor made these transfers possible to injure, delay and defraud creditors, including the Plaintiffs herein.

79.  Plaintiffs are informed and believe that the debtor transferred funds to these new related companies with the intent to hinder, delay and defraud creditors within 90 days of petition date.

**TENTH CLAIM FOR RELIEF FOR DISALLOWANCE OF CLAIMS**

88.  The Court can and should disallow any and all claims made in this bankruptcy by Patel, defendants or any other insiders of Patel or the debtor, as that term is defined under the bankruptcy code, by virtue of defendants multiple violations of the FCA, HIPAA, unfair competition, fraud and deceit and related misconduct that gave rise to Plaintiffs' claims in an amount to be shown in accordance with proof of the time of trial .

**ELEVENTH CLAIM FOR RELIEF FOR UNJUST ENRICHMENT**

89.  As a direct and proximate result of defendants' Medicare and procurement fraud, HIPAA violations, unfair competition, fraud and deceit, fraudulent transfers and embezzlement and related misconduct, defendants, and each of them, have been unjustly enriched to the detriment of United States and the Plaintiffs herein.

90.  Accordingly, the Court can and should enter an order directing that defendants disgorge any and all unlawful profits and ill-gotten gains obtained a received result of their continuing misconduct.

WHEREFORE, Plaintiffs pray for judgment as follows:

1.  For damages in an amount not less than $500 million payable to the United States government and in particular, to the United States government's Medicare program based upon defendants' multiple violations of the FCA, including HIPPA violations;

2.  For an order that Plaintiffs be allowed to share in the Justice Department's recovery in an amount not less than 15 percent nor more than 30%;

3.  For damages in an amount not less than $10 million as a result defendants' unfair competition and fraud and deceit;

4.  For rescission and restitution of the SPA;

5.  Alternatively, for damages in an amount not less than $10 million for defendants' breach of the SPA;

6.  For an order rescinding all fraudulent conveyances and directing defendants and any other insiders to return all ill-gotten proceeds to the bankruptcy estate;

19

1    defendants dispute that Plaintiffs are entitled to rescind the PSA for the reasons stated hereinabove, and

2    entitled to restitution.

3       73. An adjudication and declaratory judgment is necessary and appropriate at this time so that the

4    parties can ascertain their rights and obligations.

5

### SEVENTH CLAIM FOR RELIEF FOR INJUNCTIVE RELIEF

6       74. By virtue of the wrongful and fraudulent acts described hereinabove, including defendants'

7    continued violation of the FCA, multiple and continuing HIPAA violations, unfair competition,

8    embezzlement and fraudulent conveyances, Plaintiffs are entitled to a Temporary Restraining Order,

9    preliminary injunction and permanent injunction to enjoin and restrain defendants, and each of them, from

10    further violations of the FCA and from committing or perpetrating the other continuing fraudulent and

11    wrongful acts described hereinabove.

12

### EIGHTH CLAIM FOR RELIEF TO AVOID FRAUDULENT TRANSFERS

13

14       76. On or about October 15, 2020, Patel voluntarily instituted and instigated this Chapter 11

15    proceeding for the improper purpose of terminating (by virtue of the automatic stay) pending litigation that

16    was and is being prosecuted by Dr. Smith in the Los Angeles County Superior Court. The State Court

17    Actions seeks some of the same relief sought in this adversary proceeding based on similar claims.

18       77. Plaintiffs are informed and believe, and based thereon aver that the debtor, through Patel,

19    transferred funds and other property of the debtor to a number of third parties, including the defendants

20    herein, within two years of the petition date. For example, Dr. Smith recently obtained personal

21    knowledge that the debtor transferred more than $1.2 million to two secret companies that defendants

22    created and formed just prior to filing the bankruptcy petition – namely, defendants Allied Clinical Trial,

23    LLC and Platnik Smith Health Corp.

24       78. At all times herein mentioned, Patel's indirect, de facto ownership of the debtor and access to

25    the debtor's corporate accounts gave him the opportunity, the debtor made these transfers possible to

26    injure, delay and defraud creditors, including the Plaintiffs herein.

27       79. Plaintiffs are informed and believe that the debtor transferred funds to these new related

28    companies with the intent to hinder, delay and defraud creditors within 90 days of petition date.

80. Plaintiffs are therefore entitled to avoid the transfer under section 548(a)(1) of the Bankruptcy Code and/or section 544(b) of the Bankruptcy Code and California Civil Code section 3439.04(a).

81. Pursuant to section 550 of the Bankruptcy Code Plaintiffs are entitled to recover from defendants all property fraudulently transferred the value thereof, in an amount be proved at trial in accordance with proof.

82. Pursuant to California Civil Code section 3439.04(a), Plaintiffs are also entitled to obtain:

    1) avoidance of the transfer;

    2) an injunction against further disposition by the debtor or defendants, or both, on the asset transferred or their proceeds;

    3) and any other relief the circumstances may require.

**NINTH CLAIM FOR RELIEF TO AVOID AND RECOVER PREFERENTIAL TRANSFERS**

83. On or within 90 days of the petition date, the debtor, through Patel, made transfers or caused to be transferred money or property of the debtor to defendants, as well as presently known insiders of Patel.

84. The debtor made the transfer, at least in part, to such defendants and such insiders for or on account of antecedent indebtedness owed by the debtor or Patel to these codefendants or such insiders.

85. At the time the debtor and Patel made the transfers alleged hereinabove, the debtor was insolvent (as that term is defined under the Bankruptcy Code).

86. At all times herein mentioned, the preferential transfers enabled the defendants and insiders, as creditors of the debtor or alleged creditors, to receive more than they would have received had the transfer not been made, and said defendants and insiders instead would receive payment on their claims only to the extent provided for under Chapter 11 of the Bankruptcy Code.

87. Pursuant to sections 547(b) and 550 of the Bankruptcy Code, Plaintiffs may avoid the transfer of the debtor's property. Plaintiffs are also entitled to recover from said defendants and insiders an amount not less than the amount transferred plus interest at the legal rate.

7. For an order disallowing any claims made in the bankruptcy by Patel, his codefendants or any other insiders;

8. For disgorgement of any ill-gotten gains obtained a received as a result of defendants' fraudulent activities;

9. For attorneys' fees in an amount to be shown in accordance with proof ;

10. For the cost of suit herein incurred; and

11. For such other relief as the court deems just and proper.

DATED: January 7, 2020

LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation

By:_____
Michael E. Reznick
Attorney for GREGORY SMITH, M.D. and
CARMELITA YAMBALIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Smith Gregory

- Documents (87)
- Fax (232)
- Note (44)
- Lab (0-7/055/209)
- Reminder (55)
- Sign off (519)
- Prescription (8)
- eRx (19)

Sign Off

| Patient | Date | Procedure | Provider | Visit Type | Visit Status | S Case |
|---|---|---|---|---|---|---|
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☑ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | | P Friedman, Anil (Y)<br>F Friedman, Anil (Y) | | | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>S Smith Gregory | | | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (N) | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | Smith Gregory | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☑ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Friedman, Anil (Y)<br>F Friedman, Anil (Y) | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (N) | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | ANNUAL WELLNESS Exam | S Smith Gregory<br>S Smith Gregory | PHONE VISIT | ☑ | ☐ General |
| | 12/30/20 | | S Friedman, Anil (N)<br>S Smith Gregory | | | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (N) | PHONE VISIT | ☐ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☑ | ☐ Pending |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☑ | ☐ General |
| | 12/30/20 | PHONE CALL VISIT | S Smith Gregory<br>F Friedman, Anil (Y) | PHONE VISIT | ☑ | ☐ General |

Chart View<br>0/Reminder<br>Last Visit<br>Visit Type:<br>Procedure:<br>All<br>Provider: Any

From:   To:<br>Patient ( )

s Select All    : Deselect All    Sign Off

1
2
3
4
5
6
7
8
9
10
11
12
13
# EXHIBIT B
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FILED

1    NICOLA T. HANNA                 2019 SEP 17 PM 3: 58
      United States Attorney
2    BRANDON D. FOX                CLERK U.S. DISTR:
      Assistant United States Attorney     CENTRAL DISI. / CAL
3    Chief, Criminal Division           LOS ANGELES
      ASHWIN JANAKIRAM (Cal. Bar No. 277513)
4    Assistant United States Attorneys
      Major Frauds Section
5       1100 United States Courthouse
         312 North Spring Street
6       Los Angeles, California 90012
         Telephone: (213) 894-2875
7       Facsimile: (213) 894-0141
         E-mail:    ashwin.janakiram@usdoj.gov
8
      Attorneys for Plaintiff
9    UNITED STATES OF AMERICA

10               UNITED STATES DISTRICT COURT

11           FOR THE CENTRAL DISTRICT OF CALIFORNIA

12    UNITED STATES OF AMERICA,     NO. CR 00554 JFW

13         Plaintiff,           PLEA AGREEMENT FOR DEFENDANT
                           AMIR FRIEDMAN
14             v.

15    AMIR FRIEDMAN,

16         Defendant.

17

18       1.    This constitutes the plea agreement between AMIR FRIEDMAN

19    ("defendant") and the United States Attorney's Office for the Central

20    District of California ("the USAO") in the investigation of

21    defendant's receipt of kickbacks and bribes from New Age

22    Pharmaceuticals, Inc. This agreement is limited to the USAO and

23    cannot bind any other federal, state, local, or foreign prosecuting,

24    enforcement, administrative, or regulatory authorities.

25                DEFENDANT'S OBLIGATIONS

26       2.    Defendant agrees to:

27          a.    At the earliest opportunity requested by the USAO and

28    provided by the Court, appear and plead guilty to a single-count

1  information in the form attached to this agreement as Exhibit A or a

2  substantially similar form (the "information"), which charges

3  defendant with conspiracy to commit honest services mail and wire

4  fraud and interstate travel in aid of bribery, in violation of 18

5  U.S.C. § 371.

6         b.   Not contest facts agreed to in this agreement.

7         c.   Abide by all agreements regarding sentencing contained

8  in this agreement.

9         d.   Appear for all court appearances, surrender as ordered

10  for service of sentence, obey all conditions of any bond, and obey

11  any other ongoing court order in this matter.

12         e.   Not commit any crime; however, offenses that would be

13  excluded for sentencing purposes under United States Sentencing

14  Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

15  within the scope of this agreement.

16         f.   Be truthful at all times with the United States

17  Probation and Pretrial Services Office and the Court.

18         g.   Pay the applicable special assessment at or before the

19  time of sentencing unless defendant lacks the ability to pay and

20  prior to sentencing submits a completed financial statement on a form

21  to be provided by the USAO.

22   3.   Defendant further agrees:

23         a.   To forfeit personally and on behalf of any Defendant

24  Entity (defined as any entity in which defendant has held an

25  ownership interest; in which defendant has served as an officer,

26  director, manager, partner, trustee or other representative; or over

27  which defendant has had the ability, whether through position or

28  formal or informal agreement, to exercise control), all right, title,

1   and interest in and to any and all monies, properties, and/or assets

2   of any kind, derived from or acquired as a result of, or used to

3   facilitate the commission of, or involved in the illegal activity to

4   which defendant is pleading guilty (the "Forfeitable Assets").

5              b.    To the Court's entry of an order of forfeiture at or

6   before sentencing with respect to the Forfeitable Assets and to the

7   forfeiture of the assets.

8              c.    To take whatever steps are necessary to pass to the

9   United States clear title to the Forfeitable Assets, including,

10  without limitation, the execution of a consent decree of forfeiture

11  and the completing of any other legal documents required for the

12  transfer of title to the United States.

13             d.    Not to contest any administrative forfeiture

14  proceedings or civil judicial proceedings commenced against the

15  Forfeitable Assets.  If defendant submitted a claim and/or petition

16  for remission for all or part of the Forfeitable Assets on behalf of

17  himself or any other individual or entity, defendant shall and hereby

18  does withdraw any such claims or petitions, and further agrees to

19  waive any right he may have to seek remission or mitigation of the

20  forfeiture of the Forfeitable Assets.

21             e.    Not to assist any other individual in any effort

22  falsely to contest the forfeiture of the Forfeitable Assets.

23             f.    Not to claim that reasonable cause to seize the

24  Forfeitable Assets was lacking.

25             g.    To prevent the transfer, sale, destruction, or loss of

26  any and all assets described above to the extent defendant has the

27  ability to do so.

28

                                    3

1        h.   To fill out and deliver to the USAO a completed

2   financial statement listing defendant's assets on a form provided by

3   the USAO.

4        i.   That forfeiture of Forfeitable Assets shall not be

5   counted toward satisfaction of any special assessment, fine,

6   restitution, costs, or other penalty the Court may impose.

7        j.   To the entry as part of defendant's guilty plea of a

8   money judgment of forfeiture against defendant and any Defendant

9   Entity in the amount of $788,140, which sum defendant admits

10  defendant obtained, received and possessed as a result of his

11  violation of 18 U.S.C. § 371, as charged in the information, and

12  which judgment defendant agrees can be enforced against assets owned

13  by defendant.

14       k.   Defendant further agrees, should the USAO in its sole

15  discretion instruct defendant in writing to do so, to make the

16  payments set forth above via wire transfer, rather than by delivery

17  of a cashier's check, to an account designated in writing by the

18  USAO.

19       l.   Defendant understands that the money judgment of

20  forfeiture is part of defendant's sentence, and is separate from any

21  fines or restitution that may be imposed by the Court.  However, if

22  the Money Laundering and Asset Recovery Section ("MLARS") of the

23  Department of Justice grants any petition for remission submitted by

24  a victim of defendant's illegal activities as set forth in the

25  information attached to this agreement as Exhibit A, then the USAO

26  will not object to defendant receiving a credit towards payment of

27  restitution in the amount actually paid to the victim pursuant to

28  MLARS' grant of the petition for remission.

                              4

m.   With respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture sentencing, and incorporation of the forfeiture in the judgment.  Defendant acknowledges that forfeiture of the assets is part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty plea.

4.   Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation, United States Postal Service - Office of Inspector General, and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.  This cooperation requires defendant to:

a.   Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

b.   Attend all meetings, grand jury sessions, trials or other proceedings at which defendant's presence is requested by the USAO or compelled by subpoena or court order.

c.   Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO, or its designee, inquires.

d.   If requested to do so by the USAO, act in an undercover capacity to the best of defendant's ability in connection with criminal investigations by federal, state, local, or foreign law

1   enforcement authorities, in accordance with the express instructions
2   of those law enforcement authorities.  Defendant agrees not to act in
3   an undercover capacity, tape record any conversations, or gather any
4   evidence except after a request by the USAO and in accordance with
5   express instructions of federal, state, local, or foreign law
6   enforcement authorities.
7        5.   For purposes of this agreement: (1) "Cooperation
8   Information" shall mean any statements made, or documents, records,
9   tangible evidence, or other information provided, by defendant
10  pursuant to defendant's cooperation under this agreement or pursuant
11  to the letter agreement previously entered into by the parties dated
12  October 31, 2018 (the "Letter Agreement"); and (2) "Plea Information"
13  shall mean any statements made by defendant, under oath, at the
14  guilty plea hearing and the agreed to factual basis statement in this
15  agreement.

16                        THE USAO'S OBLIGATIONS

17       6.   The USAO agrees to:
18            a.   Not contest facts agreed to in this agreement.
19            b.   Abide by all agreements regarding sentencing contained
20  in this agreement.
21            c.   Except for criminal tax violations (including
22  conspiracy to commit such violations chargeable under 18 U.S.C.
23  § 371), not further criminally prosecute defendant for violations of
24  18 U.S.C. §§ 371, 1341, 1343, 1347, 1349, 1952, 1956, and 1957, and
25  42 U.S.C. § 1320a-7b(b), arising out of defendant's conduct
26  described in the agreed-to factual set forth in paragraph 17 below.
27  Defendant understands that the USAO is free to criminally prosecute
28  defendant for any other unlawful past conduct or any unlawful conduct

1  that occurs after the date of this agreement. Defendant agrees that

2  at the time of sentencing the Court may consider the uncharged

3  conduct in determining the applicable Sentencing Guidelines range,

4  the propriety and extent of any departure from that range, and the

5  sentence to be imposed after consideration of the Sentencing

6  Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

7        d.  At the time of sentencing, provided that defendant

8  demonstrates an acceptance of responsibility for the offense up to

9  and including the time of sentencing, recommend a two-level reduction

10  in the applicable Sentencing Guidelines offense level, pursuant to

11  U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an

12  additional one-level reduction if available under that section.

13        7.  The USAO further agrees:

14        a.  Not to offer as evidence in its case-in-chief in the

15  above-captioned case or any other criminal prosecution that may be

16  brought against defendant by the USAO, or in connection with any

17  sentencing proceeding in any criminal case that may be brought

18  against defendant by the USAO, any Cooperation Information.

19  Defendant agrees, however, that the USAO may use both Cooperation

20  Information and Plea Information: (1) to obtain and pursue leads to

21  other evidence, which evidence may be used for any purpose, including

22  any criminal prosecution of defendant; (2) to cross-examine defendant

23  should defendant testify, or to rebut any evidence offered, or

24  argument or representation made, by defendant, defendant's counsel,

25  or a witness called by defendant in any trial, sentencing hearing, or

26  other court proceeding; and (3) in any criminal prosecution of

27  defendant for false statement, obstruction of justice, or perjury.

28

1         b.   Not to use Cooperation Information against defendant

2 at sentencing for the purpose of determining the applicable guideline

3 range, including the appropriateness of an upward departure, or the

4 sentence to be imposed, and to recommend to the Court that

5 Cooperation Information not be used in determining the applicable

6 guideline range or the sentence to be imposed.  Defendant

7 understands, however, that Cooperation Information will be disclosed

8 to the United States Probation and Pretrial Services Office and the

9 Court, and that the Court may use Cooperation Information for the

10 purposes set forth in U.S.S.G § 1B1.8(b) and for determining the

11 sentence to be imposed.

12         c.   In connection with defendant's sentencing, to bring to

13 the Court's attention the nature and extent of defendant's

14 cooperation.

15         d.   If the USAO determines, in its exclusive judgment,

16 that defendant has both complied with defendant's obligations under

17 paragraphs 2 and 4 above and provided substantial assistance to law

18 enforcement in the prosecution or investigation of another

19 ("substantial assistance"), to move the Court pursuant to U.S.S.G.

20 § 5K1.1 to fix an offense level and corresponding guideline range

21 below that otherwise dictated by the sentencing guidelines, and to

22 recommend a term of imprisonment within this reduced range.

23     <u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

24     8.   Defendant understands the following:

25         a.   Any knowingly false or misleading statement by

26 defendant will subject defendant to prosecution for false statement,

27 obstruction of justice, and perjury and will constitute a breach by

28 defendant of this agreement.

1       b.  Nothing in this agreement requires the USAO or any

2  other prosecuting, enforcement, administrative, or regulatory

3  authority to accept any cooperation or assistance that defendant may

4  offer, or to use it in any particular way.

5       c.  Defendant cannot withdraw defendant's guilty plea if

6  the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a

7  reduced guideline range or if the USAO makes such a motion and the

8  Court does not grant it or if the Court grants such a USAO motion but

9  elects to sentence above the reduced range.

10       d.  At this time the USAO makes no agreement or

11  representation as to whether any cooperation that defendant has

12  provided or intends to provide constitutes or will constitute

13  substantial assistance.  The decision whether defendant has provided

14  substantial assistance will rest solely within the exclusive judgment

15  of the USAO.

16       e.  The USAO's determination whether defendant has

17  provided substantial assistance will not depend in any way on whether

18  the government prevails at any trial or court hearing in which

19  defendant testifies or in which the government otherwise presents

20  information resulting from defendant's cooperation.

21                <u>NATURE OF THE OFFENSE</u>

22    9.  Defendant understands that for defendant to be guilty of

23  the crime charged in the information, that is, conspiracy, in

24  violation of Title 18, United States Code, Section 371, the following

25  must be true: (1) between in or about at least August 2013 and in or

26  about at least May 2015, there was an agreement between two or more

27  persons to commit at least one object of the conspiracy as charged in

28  the information; (2) the defendant became a member of the conspiracy

1   knowing of at least one of its objects and intending to help

2   accomplish it; and (3) one of the members of the conspiracy performed

3   at least one overt act for the purpose of carrying out the

4   conspiracy.

5          10.   Defendant understands that Honest Services Mail and Wire

6   Fraud, in violation of Title 18, United States Code, Sections 1341

7   and 1346, and 1343 and 1346, respectively, each an object of the

8   conspiracy charged in the information, have the following elements:

9   (1) the defendant devised or participated in a scheme or plan to

10  deprive a patient of his or her right to honest services; (2) the

11  scheme or plan included payments of kickbacks and bribes to medical

12  professionals in exchange for medical services or items; (3) the

13  medical professionals owed a fiduciary duty to the patients; (4) the

14  defendant acted with the intent to defraud by depriving the patients

15  of their right of honest services of the medical professionals;

16  (5) the defendant's act was material, that is, it had a natural

17  tendency to influence, or was capable of influencing, a patient's

18  acts; and (6) the defendant used, or caused someone to use, the mails

19  (in the case of Honest Services Mail Fraud) and a wire communication

20  (in the case of Honest Services Wire Fraud) to carry out or attempt

21  to carry out the scheme or plan.

22         11.   Defendant understands that Interstate Travel in Aid of

23  Bribery, in violation of Title 18, United States Code, Section

24  1952(a)(3), one of the objects of the conspiracy charged in the

25  information, has the following elements: (1) defendant used the mail

26  or a facility of interstate commerce, (2) with the intent to promote,

27  manage, establish, or carry on, or facilitate the promotion,

28  management, establishment, or carrying on, of unlawful activity,

1  specifically bribery in violation of California law, including
2  California Business & Professions Code § 650 and California Insurance
3  Code § 750; and (3) after doing so, defendant performed or attempted
4  to perform an act to promote, manage, establish, or carry on, or
5  facilitate the promotion, management, establishment, or carrying on,
6  of such unlawful activity.

                    PENALTIES AND RESTITUTION

7
8       12.  Defendant understands that the statutory maximum sentence
9  that the Court can impose for a violation of Title 18, United States
10 Code, Section 371, as charged in count one of the Information, is:
11 five years' imprisonment, a three-year period of supervised release;
12 a fine of $250,000 or twice the gross gain or gross loss resulting
13 from the offense, whichever is greater; and a mandatory special
14 assessment of $100.

15      13.  Defendant understands that defendant will be required to
16 pay full restitution to the victims of the offense to which defendant
17 is pleading guilty.  Defendant agrees that, in return for the USAO's
18 compliance with its obligations under this agreement, the Court may
19 order restitution to persons other than the victims of the offense to
20 which defendant is pleading guilty and in amounts greater than those
21 alleged in the count to which defendant is pleading guilty.  In
22 particular, defendant agrees that the Court may order restitution to
23 any victim of any of the following for any losses suffered by that
24 victim as a result: (a) any relevant conduct, as defined in U.S.S.G.
25 § 1B1.3, in connection with the offenses to which defendant is
26 pleading guilty; and (b) any charges not prosecuted pursuant to this
27 agreement as well as all relevant conduct, as defined in U.S.S.G.
28 § 1B1.3, in connection with those charges.

1      14.   Defendant understands that supervised release is a period

2   of time following imprisonment during which defendant will be subject

3   to various restrictions and requirements.   Defendant understands that

4   if defendant violates one or more of the conditions of any supervised

5   release imposed, defendant may be returned to prison for all or part

6   of the term of supervised release authorized by statute for the

7   offense that resulted in the term of supervised release, which could

8   result in defendant serving a total term of imprisonment greater than

9   the statutory maximum stated above.

10     15.   Defendant understands that, by pleading guilty, defendant

11  may be giving up valuable government benefits and valuable civic

12  rights, such as the right to vote, the right to possess a firearm,

13  the right to hold office, and the right to serve on a jury.

14  Defendant understands that once the Court accepts defendant's guilty

15  plea, it will be a federal felony for defendant to possess a firearm

16  or ammunition.   Defendant understands that the conviction in this

17  case may also subject defendant to various other collateral

18  consequences, including but not limited to revocation of probation,

19  parole, or supervised release in another case and suspension or

20  revocation of a professional license.   Defendant understands that

21  unanticipated collateral consequences will not serve as grounds to

22  withdraw defendant's guilty plea.

23     16.   Defendant understands that, if defendant is not a United

24  States citizen, the felony conviction in this case may subject

25  defendant to: removal, also known as deportation, which may, under

26  some circumstances, be mandatory; denial of citizenship; and denial

27  of admission to the United States in the future.   The Court cannot,

28  and defendant's attorney also may not be able to, advise defendant

1    fully regarding the immigration consequences of the felony conviction

2    in this case.  Defendant understands that unexpected immigration

3    consequences will not serve as grounds to withdraw defendant's guilty

4    plea.

5                        FACTUAL BASIS

6       17.  Defendant admits that defendant is, in fact, guilty of the

7    offense to which defendant is agreeing to plead guilty.  Defendant

8    and the USAO agree to the statement of facts provided below and agree

9    that this statement of facts is sufficient to support a plea of

10    guilty to the charge described in this agreement and to establish the

11    Sentencing Guidelines factors set forth in paragraph 19 below but is

12    not meant to be a complete recitation of all facts relevant to the

13    underlying criminal conduct or all facts known to either party that

14    relate to that conduct.

15    <u>Relevant Entities and Individuals</u>

16       Defendant was an anesthesiologist licensed in California, who

17    owed a fiduciary duty to his patients to act in their best interests,

18    and not for his own professional, pecuniary, or personal gain.

19    Defendant violated his fiduciary duty to patients by accepting

20    kickbacks and bribes for writing prescriptions for compounded drugs

21    for his patients.

22       Pharmacy Owner A ("Pharmacy Owner A"), along with other un-

23    indicted conspirators, owned and operated several compounding

24    pharmacies, including New Age Pharmaceuticals, Inc. ("New Age"),

25    located in Beverly Hills, California, within the Central District of

26    California.  New Age was reimbursed by insurance companies under the

27    California Workers' Compensation System, among other health care

28    benefit programs, for dispensing prescription drugs and other

1  pharmaceuticals, including "custom" over-the-counter drugs, such as
2  Terocin, which was a pain relief product for minor aches and pains of
3  muscles and joints.
4      Marketer A ("Marketer A") was a marketer, based in California,
5  who, through Marketing Entity A, was paid commissions for
6  facilitating the referral of prescriptions for compounded drugs and
7  other pharmaceuticals such as Terocin.
8      The Kickback and Bribe Arrangement
9      No later than approximately August 2013, and continuing through
10 approximately May 2015, in Los Angeles County, within the Central
11 District of California, and elsewhere, defendant, Pharmacy Owner A,
12 and Marketer A, conspired to commit honest services mail and wire
13 fraud and Travel Act violations.
14     As part of the conspiracy, Marketer A provided pre-printed
15 prescription pads for compounded drugs to defendant and offered
16 defendant kickbacks and bribes for each such prescription he
17 authorized (the "Kickback-Tainted Prescriptions"). Influenced by the
18 promise of kickbacks and bribes, defendant authorized the Kickback-
19 Tainted Prescriptions for dispensing at New Age, among other
20 pharmacies. After processing the Kickback-Tainted Prescriptions, New
21 Age dispensed the compounded drugs, billed insurance companies for
22 reimbursement, and shipped the compounded drugs to patients through
23 the mail.
24     Knowledge/Willfulness
25     Defendant and his co-conspirators knew that the payment of
26 kickbacks and bribes for the referral of prescriptions for compounded
27 drugs was illegal. Defendant further understood that, had he stopped
28 authorizing prescription referrals for New Age, Marketer A would

                                    14

1    cease making payments for the benefit of defendant.  In accepting the
2    kickbacks and bribes, defendant intended to defraud the patients for
3    whom he referred prescriptions to New Age by depriving them of his
4    honest services.  The use of interstate wires and mailings to execute
5    essential parts of the scheme was foreseeable to defendant and his
6    co-conspirators.  Moreover, interstate wires and mailings were, in
7    fact, used to execute essential parts of the scheme and to distribute
8    the proceeds of, and promote, manage, establish, carry on, and
9    facilitate the promotion, management, establishment, and carrying out
10   of unlawful activity, specifically the payment and receipt of
11   kickbacks and bribes, in violation of California Business &
12   Professions Code Section 650(a) and California Insurance Code Section
13   750(a).

14        Defendant was also aware that the compounded drugs he prescribed
15   were far more expensive than the FDA-approved drug equivalents that
16   were otherwise available.  Defendant understood that the payment of
17   kickbacks and bribes for the referral of prescriptions for compounded
18   drugs was material to both patients and health care benefit programs
19   to which New Age submitted claims for Kickback Tainted Prescriptions.
20   In other words, defendant knew that these patients and programs would
21   have wanted to know that defendant was receiving kickbacks and bribes
22   in connection with prescribing compounded drugs for dispensing at New
23   Age.

24        Overt Acts
25        In furtherance of the conspiracy and to accomplish its objects,
26   defendant and his co-conspirators committed various overt acts within
27   the Central District of California, and elsewhere, specifically
28   including, on or about March 27, 2015, defendant caused Marketer A to

1  issue check number 1110, drawn on Marketing Entity A's Bank of

2  America account ending in 0636, in the amount of $40,000, to

3  defendant in exchange for Kickback-Tainted Prescriptions.

4        <u>Effects of the Conspiracy</u>

5        All told, the conspiracy resulted in financial gains to

6  defendant of approximately $788,140 -- a sum he received in the form

7  of approximately 28 check payments that represented the proceeds of

8  honest services mail and wire fraud and Travel Act violations.

9                          <u>SENTENCING FACTORS</u>

10       18.  Defendant understands that in determining defendant's

11  sentence the Court is required to calculate the applicable Sentencing

12  Guidelines range and to consider that range, possible departures

13  under the Sentencing Guidelines, and the other sentencing factors set

14  forth in 18 U.S.C. § 3553(a).  Defendant understands that the

15  Sentencing Guidelines are advisory only, that defendant cannot have

16  any expectation of receiving a sentence within the calculated

17  Sentencing Guidelines range, and that after considering the

18  Sentencing Guidelines and the other § 3553(a) factors, the Court will

19  be free to exercise its discretion to impose any sentence it finds

20  appropriate up to the maximum set by statute for the crime of

21  conviction.

22       19.  Defendant and the USAO agree to the following applicable

23  Sentencing Guidelines factors:

24  ///

25  ///

26  ///

27

28

                                  16

| | | |
|---|---|---|
| Base Offense Level: | 8 | [U.S.S.G. §§ 2X1.1(a), 2E1.2, 2B4.1] |
| Loss greater than $550K: | +14 | [U.S.S.G. § 2B1.1(b)(1)(H)] |
| Abuse of Position of Trust: | +2 | [U.S.S.G. § 3B1.3] |
| Acceptance of Responsibility | -3 | [U.S.S.G. § 3E1.1] |
| Total Offense Level: | 21 | |

The USAO will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 6(d) are met and if defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below.  Subject to paragraphs 7(d) above and 35 below, defendant and the USAO agree not to seek or argue, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed. Defendant agrees, however, that if, after signing this agreement but prior to sentencing, defendant were to commit an act, or the USAO were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the USAO, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the USAO would be free to seek the enhancement set forth in that section and to argue that defendant is not entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.

20.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

1    21.   Defendant and the USAO reserve the right to argue for a

2 sentence outside the sentencing range established by the Sentencing

3 Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

4 (a)(2), (a)(3), (a)(6), and (a)(7).

5                   <u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

6    22.   Defendant understands that by pleading guilty, defendant

7 gives up the following rights:

8         a.   The right to persist in a plea of not guilty.

9         b.   The right to a speedy and public trial by jury.

10         c.   The right to be represented by counsel — and if

11 necessary have the court appoint counsel — at trial.  Defendant

12 understands, however, that, defendant retains the right to be

13 represented by counsel — and if necessary have the court appoint

14 counsel — at every other stage of the proceeding.

15         d.   The right to be presumed innocent and to have the

16 burden of proof placed on the government to prove defendant guilty

17 beyond a reasonable doubt.

18         e.   The right to confront and cross-examine witnesses

19 against defendant.

20         f.   The right to testify and to present evidence in

21 opposition to the charges, including the right to compel the

22 attendance of witnesses to testify.

23         g.   The right not to be compelled to testify, and, if

24 defendant chose not to testify or present evidence, to have that

25 choice not be used against defendant.

26         h.   Any and all rights to pursue any affirmative defenses,

27 Fourth Amendment or Fifth Amendment claims, and other pretrial

28 motions that have been filed or could be filed.

## WAIVER OF VENUE

23.   Having been fully advised by defendant's attorney regarding the requirements of venue with respect to the offense to which defendant is pleading guilty, to the extent the offense to which defendant is pleading guilty was committed, begun, or completed outside the Central District of California, defendant knowingly, voluntarily, and intelligently waives, relinquishes, and gives up: (a) any right that defendant might have to be prosecuted only in the district where the offense to which defendant is pleading guilty were committed, begun, or completed; and (b) any defense, claim, or argument defendant could raise or assert based upon lack of venue with respect to the offense to which defendant is pleading guilty.

## WAIVER OF STATUTE OF LIMITATIONS

24.   Having been fully advised by defendant's attorney regarding application of the statute of limitations to the offense to which defendant is pleading guilty, defendant hereby knowingly, voluntarily, and intelligently waives, relinquishes, and gives up: (a) any right that defendant might have not to be prosecuted for the offense to which defendant is pleading guilty because of the expiration of the statute of limitations for the offense prior to the filing of the information alleging the offense; and (b) any defense, claim, or argument defendant could raise or assert that prosecution of the offense to which defendant is pleading guilty is barred by the expiration of the applicable statute of limitations, pre-indictment delay, or any speedy trial violation.

## WAIVER OF APPEAL OF CONVICTION

25.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary,

19

1   by pleading guilty defendant is waiving and giving up any right to
2   appeal defendant's conviction on the offense to which defendant is
3   pleading guilty.  Defendant understands that this waiver includes,
4   but is not limited to, arguments that the conspiracy statute to which
5   defendant is pleading guilty, or the underling objects of the charged
6   conspiracy are unconstitutional, and any and all claims that the
7   statement of facts provided herein is insufficient to support
8   defendant's plea of guilty.

9                LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

10       26.  Defendant agrees that, provided the Court imposes a term of
11  imprisonment within the total statutory maximum, defendant gives up
12  the right to appeal all of the following: (a) the procedures and
13  calculations used to determine and impose any portion of the
14  sentence; (b) the term of imprisonment imposed by the Court; (c) the
15  fine imposed by the Court, provided it is within the statutory
16  maximum; (d) the amount and terms of any restitution order; (e) the
17  term of probation or supervised release imposed by the Court,
18  provided it is within the statutory maximum; and (f) any of the
19  following conditions of probation or supervised release imposed by
20  the Court: the conditions set forth in General Order 18-10 of this
21  Court; the drug testing conditions mandated by 18 U.S.C.
22  §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions
23  authorized by 18 U.S.C. § 3563(b)(7).

24       27.  Defendant also gives up any right to bring a post-
25  conviction collateral attack on the conviction or sentence, including
26  any order of restitution, except a post-conviction collateral attack
27  based on a claim of ineffective assistance of counsel, a claim of
28  newly discovered evidence, or an explicitly retroactive change in the

1    applicable Sentencing Guidelines, sentencing statutes, or statutes of

2    conviction.  Defendant understands that this waiver includes, but is

3    not limited to, arguments that the either the conspiracy statute or

4    the statutes underlying the objects of the conspiracy to which

5    defendant is pleading guilty are unconstitutional, and any and all

6    claims that the statement of facts provided herein is insufficient to

7    support defendant's plea of guilty.

8        28.  This agreement does not affect in any way the right of the

9    USAO to appeal the sentence imposed by the Court.

10               RESULT OF WITHDRAWAL OF GUILTY PLEA

11       29.  Defendant agrees that if, after entering a guilty plea

12   pursuant to this agreement, defendant seeks to withdraw and succeeds

13   in withdrawing defendant's guilty plea on any basis other than a

14   claim and finding that entry into this plea agreement was

15   involuntary, then (a) the USAO will be relieved of all of its

16   obligations under this agreement, including in particular its

17   obligations regarding the use of Cooperation Information; (b) in any

18   investigation, criminal prosecution, or civil, administrative, or

19   regulatory action, defendant agrees that any Cooperation Information

20   and any evidence derived from any Cooperation Information shall be

21   admissible against defendant, and defendant will not assert, and

22   hereby waives and gives up, any claim under the United States

23   Constitution, any statute, or any federal rule, that any Cooperation

24   Information or any evidence derived from any Cooperation Information

25   should be suppressed or is inadmissible; and (c) should the USAO

26   choose to pursue any charge that was not filed as a result of this

27   agreement, then (i) any applicable statute of limitations will be

28   tolled between the date of defendant's signing of this agreement and

1  the filing commencing any such action; and (ii) defendant waives and

2  gives up all defenses based on the statute of limitations, any claim

3  of pre-indictment delay, or any speedy trial claim with respect to

4  any such action, except to the extent that such defenses existed as

5  of the date of defendant's signing this agreement.

6                 RESULT OF VACATUR, REVERSAL OR SET-ASIDE

7       30.  Defendant agrees that if the count of conviction is

8  vacated, reversed, or set aside, both the USAO and defendant will be

9  released from all their obligations under this agreement.

10                   EFFECTIVE DATE OF AGREEMENT

11      31.  This agreement is effective upon signature and execution of

12  all required certifications by defendant, defendant's counsel, and an

13  Assistant United States Attorney.

14                      BREACH OF AGREEMENT

15      32.  Defendant agrees that if defendant, at any time after the

16  effective date of this agreement, knowingly violates or fails to

17  perform any of defendant's obligations under this agreement ("a

18  breach"), the USAO may declare this agreement breached.  For example,

19  if defendant knowingly, in an interview, before a grand jury, or at

20  trial, falsely accuses another person of criminal conduct or falsely

21  minimizes defendant's own role, or the role of another, in criminal

22  conduct, defendant will have breached this agreement.  All of

23  defendant's obligations are material, a single breach of this

24  agreement is sufficient for the USAO to declare a breach, and

25  defendant shall not be deemed to have cured a breach without the

26  express agreement of the USAO in writing.  If the USAO declares this

27  agreement breached, and the Court finds such a breach to have

28  occurred, then:

                                22

1　　　　　a.　If defendant has previously entered a guilty plea

2　pursuant to this agreement, defendant will not be able to withdraw

3　the guilty plea.

4　　　　　b.　The USAO will be relieved of all its obligations under

5　this agreement; in particular, the USAO: (i) will no longer be bound

6　by any agreements concerning sentencing and will be free to seek any

7　sentence up to the statutory maximum for the crime to which defendant

8　has pleaded guilty; and (ii) will no longer be bound by any agreement

9　regarding the use of Cooperation Information and will be free to use

10　any Cooperation Information in any way in any investigation, criminal

11　prosecution, or civil, administrative, or regulatory action.

12　　　　　c.　The USAO will be free to criminally prosecute

13　defendant for false statement, obstruction of justice, and perjury

14　based on any knowingly false or misleading statement by defendant.

15　　　　　d.　In any investigation, criminal prosecution, or civil,

16　administrative, or regulatory action: (i) defendant will not assert,

17　and hereby waives and gives up, any claim that any Cooperation

18　Information was obtained in violation of the Fifth Amendment

19　privilege against compelled self-incrimination; and (ii) defendant

20　agrees that any Cooperation Information and any Plea Information, as

21　well as any evidence derived from any Cooperation Information or any

22　Plea Information, shall be admissible against defendant, and

23　defendant will not assert, and hereby waives and gives up, any claim

24　under the United States Constitution, any statute, Rule 410 of the

25　Federal Rules of Evidence, Rule 11(f) of the Federal Rules of

26　Criminal Procedure, or any other federal rule, that any Cooperation

27　Information, any Plea Information, or any evidence derived from any

28

1  Cooperation Information or any Plea Information should be suppressed
2  or is inadmissible.
3      33.  Following the Court's finding of a knowing breach of this
4  agreement by defendant, should the USAO choose to pursue any charge
5  that was not filed as a result of this agreement, then:
6          a.  Defendant agrees that any applicable statute of
7  limitations is tolled between the date of defendant's signing of this
8  agreement and the filing commencing any such action.
9          b.  Defendant waives and gives up all defenses based on
10 the statute of limitations, any claim of pre-indictment delay, or any
11 speedy trial claim with respect to any such action, except to the
12 extent that such defenses existed as of the date of defendant's
13 signing this agreement.

### COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES
### OFFICE NOT PARTIES

16     34.  Defendant understands that the Court and the United States
17 Probation and Pretrial Services Office are not parties to this
18 agreement and need not accept any of the USAO's sentencing
19 recommendations or the parties' agreements to facts or sentencing
20 factors.
21     35.  Defendant understands that both defendant and the USAO are
22 free to: (a) supplement the facts by supplying relevant information
23 to the United States Probation and Pretrial Services Office and the
24 Court, (b) correct any and all factual misstatements relating to the
25 Court's Sentencing Guidelines calculations and determination of
26 sentence, and (c) argue on appeal and collateral review that the
27 Court's Sentencing Guidelines calculations and the sentence it
28 chooses to impose are not error, although each party agrees to



PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

38. The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

NICOLA T. HANNA
United States Attorney

_____     9/17/19
ASHWIN JANAKIRAM        Date
Assistant United States Attorney

_____     9/16/2019
AMIR FRIEDMAN        Date
Defendant

_____     9/16/19
PAUL S. MEYER        Date
Attorney for Defendant
AMIR FRIEDMAN

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety and have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant sentencing guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____
AMIR BRUNO
Defendant

## CERTIFICATION OF DEFENDANT's ATTORNEY

1    I am AMIR FRIEDMAN's attorney.  I have carefully and thoroughly

2  discussed every part of this agreement with my client.  Further, I

3  have fully advised my client of his rights, of possible pretrial

4  motions that might be filed, of possible defenses that might be

5  asserted either prior to or at trial, of the sentencing factors set

6  forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

7  provisions, and of the consequences of entering into this agreement.

8  To my knowledge: no promises, inducements, or representations of any

9  kind have been made to my client other than those contained in this

10  agreement; no one has threatened or forced my client in any way to

11  enter into this agreement; my client's decision to enter into this

12  agreement is an informed and voluntary one; and the factual basis set

13  forth in this agreement is sufficient to support my client's entry of

14  a guilty plea pursuant to this agreement.

15

16

17                                                    9/16/19

18  _____          _____
    PAUL S. MEYER                              Date
19  Attorney for Defendant
    AMIR FRIEDMAN

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR |
|       Plaintiff, | I N F O R M A T I O N |
|         v. | [18 U.S.C. § 371: Conspiracy; 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), 982(a)(1), 982.(a)(7) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| AMIR FRIEDMAN, | |
|       Defendant. | |

The United States Attorney charges:

A.   <u>GENERAL ALLEGATIONS</u>

At times relevant to this Information:

<u>Defendant and Related Entities and Individuals</u>

1.   Pharmacy Owner A, along with other un-indicted conspirators, owned and operated several compounding pharmacies, including New Age Pharmaceuticals, Inc. ("New Age"), located in Beverly Hills, California, within the Central District of California. New Age was reimbursed by health care benefit programs for dispensing prescriptions and other pharmaceuticals, including "custom" over-the-counter drugs, such as Terocin,

1  which was a pain relief product for minor aches and pains of

2  muscles and joints.

3       2.    Unindicted co-conspirator Marketer A was a marketer,

4  based in California, who, through Marketing Entity A, was paid

5  commissions for facilitating the referral of prescriptions for

6  compounded drugs and other pharmaceuticals, including Terocin.

7       3.    Defendant AMIR FRIEDMAN was an anesthesiologist

8  licensed in California, who wrote prescriptions for compounded

9  and over-the-counter drugs for patients. Defendant FRIEDMAN

10  caused such prescriptions to be routed to New Age for

11  dispensing, in exchange for kickback and bribe payments from

12  Marketer A.

13       State Workers' Compensation System

14       4.    The California Workers' Compensation System ("CWCS")

15  was a system created by California law to provide insurance

16  covering treatment of injury and illness suffered by individuals

17  in the course of their employment.  Under the CWCS, employers

18  were required to purchase workers' compensation insurance

19  policies from insurance carriers to cover their employees.  When

20  an employee suffered a covered injury or illness and received

21  medical services, the medical service provider submitted a claim

22  for payment to the relevant insurance carrier, which then paid

23  the claim.  Claims were submitted to and paid by the insurance

24  carriers by mail and electronically.  The CWCS was governed by

25  various California laws and regulations.

26       5.    California law, including the California Business and

27  Professions Code and the California Insurance Code, prohibited

28

2

1  the offering, delivering, soliciting, or receiving of anything

2  of value in return for referring a patient for medical items or

3  services.

4      <u>Fiduciary Duties</u>

5      6.   Physicians, among other medical professionals, owed a

6  fiduciary duty to their patients, requiring these fiduciaries to

7  act in the best interest of the patients, and not for their own

8  professional, pecuniary, or personal gain.  These fiduciaries

9  owed a duty of honest services to their patients for decisions

10 made relating to the medical care and treatment of those

11 patients, including the recommending and prescribing of

12 pharmaceuticals to such patients.  A patient's right to honest

13 services from these fiduciaries included the right not to have

14 the fiduciaries solicit or accept bribes and kickbacks connected

15 to the medical care or treatment of such patients/customers.

16     <u>Health Care Programs</u>

17     7.   State workers' compensation insurance carriers, along

18 with other public and private plans and contracts that New Age

19 billed for compounded drug prescription reimbursements, were

20 "health care benefit programs," as defined by 18 U.S.C. § 24(b),

21 that affected commerce (collectively, the "Affected Health Care

22 Plans").

23     <u>Compounded Drugs</u>

24     8.   In general, "compounding" was a practice in which a

25 licensed pharmacist, a licensed physician, or, in the case of an

26 outsourcing facility, a person under the supervision of a

27 licensed pharmacist, combined, mixed, or altered ingredients of

28

1  a drug or multiple drugs to create a drug tailored to the needs

2  of an individual patient.  The Food & Drug Administration did

3  not verify the safety, potency, effectiveness, or manufacturing

4  quality of compounded drugs, that is, compounded drugs were not

5  FDA-approved.  The California State Board of Pharmacy regulated

6  the practice of compounding in the State of California.

7      9.  Compounded drugs were prescribed by a physician when

8  an FDA-approved drug did not meet the health needs of a

9  particular patient.  For example, if a patient were allergic to

10 a specific ingredient in an FDA-approved medication, such as a

11 dye or a preservative, a compounded drug would be prepared

12 excluding the substance that triggered the allergic reaction.

13 Compounded drugs would also be prescribed when a patient could

14 not consume a medication by traditional means, such as an

15 elderly patient or a child who could not swallow an FDA-approved

16 pill and needed the drug in a liquid form that was not otherwise

17 available.

18 B.  OBJECTS OF THE CONSPIRACY

19     10.  Beginning by no later than in or about August 2013,

20 and continuing through at least in or about May 2015, in Los

21 Angeles County, within the Central District of California, and

22 elsewhere, defendant FRIEDMAN, Pharmacy Owner A, and Marketer A,

23 and others known and unknown to the United States Attorney,

24 knowingly conspired to commit the following offenses against the

25 United States:

26     a.  mail fraud, including through the deprivation of

27 honest services, in violation of Title 18, United States Code,

28 Sections 1341 and 1346;

1          b.    wire fraud, including through the deprivation of

2    honest services, in violation of Title 18, United States Code,

3    Sections 1343 and 1346; and

4          c.    use of the mails and interstate facilities in aid

5    of bribery, in violation of Title 18, United States Code,

6    Section 1952(a)(1) and (3).

7    C.   MANNER AND MEANS OF THE CONSPIRACY

8          11.   The objects of the conspiracy were carried out, and to

9    be carried out, in substance, as follows:

10         a.    Pharmacy Owner A would pay Marketer A kickbacks

11   in exchange for arranging for, recommending, and causing the

12   referral of, pre-formulated prescriptions for compounded drugs

13   and other pharmaceuticals (collectively, "Kickback Tainted

14   Prescriptions") to New Age.

15         b.    Based on these payments, Marketer A would offer

16   kickbacks and bribes to defendant FRIEDMAN, who, in response to

17   the promise of kickbacks and bribes, would refer and cause the

18   referral of Kickback Tainted Prescriptions to New Age.

19         c.    New Age would dispense compounded drugs and other

20   pharmaceuticals authorized by the Kickback Tainted

21   Prescriptions, send these items to patient-beneficiaries through

22   the mail, and submit the corresponding claims for reimbursement

23   to the Affected Health Care Plans.

24         d.    Based on these reimbursements, New Age would pay

25   Marketer A, who, in turn, would write checks representing

26   kickback and bribe payments to defendant FRIEDMAN, who would

27   continue to authorize Kickback Tainted Prescriptions.

28

D.   OVERT ACTS

12.   In furtherance of the conspiracy and to accomplish its objects, on or about the following dates, defendant FRIEDMAN and other co-conspirators known and unknown to the United States Attorney, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California and elsewhere:

Overt Act No. 1:    On or about August 7, 2013, defendant FRIEDMAN caused Marketer A to issue check number 2032, drawn on Marketing Entity A's Bank of America account ending in 0636 (the "0636 BofA Acct"), in the amount of $22,000, to defendant FRIEDMAN.

Overt Act No. 2:    On or about March 27, 2015, defendant FRIEDMAN caused Marketer A to issue check number 1110, drawn on the 0636 BofA Acct, in the amount of $40,000, to defendant FRIEDMAN.

Overt Act No. 3:    On or about May 28, 2015, defendant FRIEDMAN caused Marketer A to issue check number 1147, drawn on the 0636 BofA, in the amount of $32,600, to defendant FRIEDMAN.

FORFEITURE ALLEGATION

[18 U.S.C. §§ 982(a)(7), 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

13.  Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given to defendant FRIEDMAN that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant FRIEDMAN's conviction of the offense set forth in this Information.

14.  Defendant FRIEDMAN so convicted shall forfeit to the United States of America the following:

(a)  all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

15.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant FRIEDMAN so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of defendant FRIEDMAN, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially

7

1  diminished in value; or (e) has been commingled with other

2  property that cannot be divided without difficulty.

3                          NICOLA T. HANNA
                           United States Attorney
4

5

6                          BRANDON D. FOX
                           Assistant United States Attorney
7                          Chief, Criminal Division

8                          RANEE A. KATZENSTEIN
                           Assistant United States Attorney
9                          Chief, Major Frauds Section

10                         KRISTEN A. WILLIAMS
                           Assistant United States Attorney
11                         Deputy Chief, Major Frauds Section

12                         ASHWIN JANAKI RAM
                           Assistant United States Attorney
13                         Major Frauds Section

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Filed 01/11/21          Case 20-24783          Doc 142

1/7/2021          Doctor Charged in $150 Million Healthcare Fraud Scheme Pleads Guilty to Conspiracy - RTK - Stander Reubens Thomas Kinsey

# Doctor Charged in $150 Million Healthcare Fraud Scheme Pleads Guilty to Conspiracy

October 28, 2019
By SRTK Shareholders

An anesthesiologist charged along with 24 other entities in a massive fraud scheme has pleaded guilty to one count of conspiracy to commit honest services mail fraud. Amir Friedman's plea agreement was accepted by the Centra District of California federal court on October 21, and will see him return for sentencing on April 6th. He was accused of receiving almost $800,000 in kickbacks for prescribing pharmaceuticals, conspiring with a pharmacy owner and a marketer to commit honest services mail and wire fraud. The pharmacy owner and several unindicted co-conspirators controlled several pharmacies, including Beverly Hills' New Age Pharmaceuticals, the compounding pharmacy whose owner had previously been charged in a fraudulent billing scheme that targeted government programs, including the California workers' compensation system, netting over $900 million in fraudulent billings. That case is scheduled to go to trial November 26th. As the New Age Pharmaceuticals case is still pending and the outcome stands to have a significant impact on other cases and claims, related liens should not be litigated or settled until the trial concludes.



STANDER REUBENS THOMAS KINSEY
California's Leading Workers' Compensation Defense Firm
Since 1979
*40th Anniversary*

# Anesthesiologist pleads guilty in connection to $150M fraud scheme

Angie Stewart - Monday, October 28th, 2019  Print | Email

A California anesthesiologist pleaded guilty to involvement in a healthcare fraud and kickback scheme, *WorkCompCentral* reports.

Amir Friedman, MD, of Calabasas, Calif., pleaded guilty to one count of conspiracy to commit honest services mail fraud in the Central District of California.

The 54-year-old anesthesiologist had also been charged with receiving about $800,000 in illegal kickbacks to prescribe compounded pharmaceuticals as part of a scheme involving Beverly Hills, Calif.-based New Age Pharmaceuticals.

Primarily targeting workers' compensation carriers, the alleged scheme defrauded Medicare, Medicaid, private carriers and union health benefit plans out of more than $150 million, according to *WorkCompCentral*.

**More articles on anesthesia:**
27 states gained Medicare-certified ASCs from 2017-18
Average salary for 5 key physician specialties
The 6 most common cases migrating to outpatient venues

*© Copyright ASC COMMUNICATIONS 2020. Interested in LINKING to or REPRINTING this content? View our policies by clicking here.*